IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 3:21-cr-024-JAG-1 |
| CHESTER A. MOODY, JR., | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, Raj Parekh, Acting United States Attorney for the Eastern District of Virginia, Olivia L. Norman, Assistant United States Attorney, and Shennie Patel, Trial Attorney with the U.S. Department of Justice's Environment and Natural Resources Division, hereby submits its Sentencing Memorandum.

The government has no objections or substantive corrections to the Presentence Report ("PSR") or the calculation of the advisory guidelines range. The probation officer determined that defendant's offense level is 16. PSR ¶ 53. With 3 points deducted for timely acceptance of responsibility, defendant's total offense level is 13. PSR ¶¶ 66, 102. Defendant has 0 criminal history points, resulting in a Criminal History Category I.  PSR ¶¶ 75, 103. Defendant's advisory sentencing guidelines range is 12 to 18 months.  PSR ¶ 103.

As set forth below, the government respectfully recommends a Guidelines sentence.

### A.  RELEVANT FACTUAL BACKGROUND

Defendant pleaded guilty to conspiracy to engage in an animal fighting venture, in violation of the Animal Welfare Act, 7 U.S.C. §§ 2156(a)(1) and (b), and 18 U.S.C. § 49. ECF No. 11. In support of that plea, defendant signed a statement of facts in which he admitted he conspired with others starting from in or before April 2013, and continuing through and

including July 11, 2018, to sponsor and exhibit dogs in animal fighting ventures, as well as to sell, buy, possess, train, transport, deliver, and receive dogs for the purposes of having the dogs participate in animal fighting ventures. ECF No. 12. Defendant admitted to having a dog fighting kennel. Defendant further admitted to setting up chain weight dog fights with coconspirators OA and EP from 2013 to 2016. He also admitted to directly participating himself in some of these chain weight dog fights, as well as in dog fights involving a several-week training regimen before the events, such as the April 3, 2016, two-card dog fight in King George, Virginia that included all four coconspirators. Specifically, regarding the April 3, 2016, dog fight, defendant admitted to establishing with coconspirators OA and EP the key terms for the fight, including the dogs' weights on the day of the fight, the forfeit amount, and wager. He admitted to traveling from Maryland to the event in which his dog won the fight against coconspirator EP's dog. Electronic evidence revealed corroborating texts on January 26, 2016, between defendant and coconspirator OA discussing key terms for the April 2016 dog fight. OA asked whether defendant had weighed his dog yet (to determine the weight at which defendant would fight his dog). Defendant texted, "I probably can make 29.5 [pounds] though. Let him [coconspirator and opponent EP] know Saturday if he don't take the 29. Cold weather stripped her weight real bad. She def[initely] underweight right now."

 Defendant also admitted to, in 2017 through July 2018, possessing, owning, training, breeding, and transporting in interstate commerce a fighting dog named "Katie" aka "Asesina" who defendant sponsored in multiple dog fights, earning her Champion fighting status.[1] The investigation further revealed a significant number of texts between defendant and various other known and unknown dog fighters regarding Katie and her fighting activities, including discussions regarding transporting her for fights, breeding her, and describing her fighting abilities, such as the following:

- *10/16/17:* "She good! Her head just swollen [and her] body in perfect condition. … OMG she can Bite!! … She ate him up. Front end and back end." (text to defendant after he inquired about a match he set up). [Bates F_CM_SW_0000015].

- *1/10/*2018: "We gonna make some moves after I make champ next week." [Bates: DF_CM_SW_0000010].

- *1/21/18*: "25 minutes Champion! … Bad to the bone. … She bite everywhere as usual. Head chest backend." [Bates: DF_CM_SW_0000010].

- *4/16/2018:* "Asesina. She looking good… Ready to hook now into 4xw[2]. … I think maybe retire Ch Asesina. I think she prove everything to me already. I will see how long it takes her to recover from kidney and bladder issues." [Bates DF_CM_SW_0000361].

---

[1]     Dogfighting has its own separate set of code words, including "Champion," which represents a dog's career status after winning three contract matches. Evidence indicated that defendant's goal was for Katie to win enough dog fights to gain Grand Champion status, after which he would retire her for breeding purposes and to build his yard. Grand Champion status indicates the dog has won five contract matches with no losses. A contract match is a pre-arranged dog fight in which the dog fighters usually establish a wager amount, fighting weights for the dogs, a forfeiture amount, and future date for the fight that gives the trainers several weeks to rigorously train and condition the dogs. This time period is referred to as a "keep."

[2]     The term "4xw" is code for a dog that has almost reached Grand Champion status by being a "Four times winner" in dog fight matches.



From 2017 to July 2018, defendant set up multiple fights for Katie including fights in Texas, Mississippi, and New York, all with the goal of reaching Grand Champion fighting status. While setting up fights, defendant also made several attempts to forcibly breed her. According to his saved electronic searches, defendant spent several weeks searching on Facebook and other means for the perfect breeding match for Katie until he arranged for a match with a Rodriqo champion fighting dog in North Carolina. In June 2018, defendant contacted coconspirator CH and others letting them know his plans regarding Katie:  "She good. I bred her to [an] Eli dog. Probably retire her and stock my yard up." (Bates DF_CH_SW_00011749).  However, On July 10, 2018, after the failed attempt to breed her with this other champion dog, defendant contacted coconspirator CH ("No pups.  She back open @ 29." (Bates DF_CH_SW_0001751)), to arrange a fight for Katie sometime after September 8, 2018, with a $4,000 wager and a fighting weight of 29 pounds since "[s]he real fat right now" and he would need time to get her back into shape. (Bates DF_CH_SW_0001749). Defendant discussed this fight setup one day before the search warrant on defendant's residence. Agents were not able to find Katie when executing search warrants in either coconspirator CM's or defendant CH's residences on July 11, 2018.

In addition to his admissions regarding his dog fighting activities with OA and EP, evidence gathered in this case, including text messages and cell phone logs, corroborated that, from 2013 to 2016, defendant routinely engaged in dog fighting activity with coconspirators OA and EP by setting up chain weight fights or attempting to set up fights with each other or other

fighters. They frequently communicated with each other via phone call, text message, or Facebook to set up both impromptu and more formal future fighting events.

 

On July 11, 2018, even though agents only seized one dog from defendant's residence, that dog exhibited multiple scars and was housed outdoors in a manner consistent with dog fighting activity. The dog was also extremely dog-aggressive, despite being extremely friendly to humans. Dog-related equipment seized from the same address, however, indicated that defendant



owned or had previously owned more dogs. Specifically, agents found eight dog crates / dog houses, several thick dog collars, several dog leashes, two dog training treadmills, multiple training poles, and various medical first aid pet supplies, including jars of wound care ointments, and wound dressings. Evidence seized from electronics, including texts, photos, and videos also indicated defendant had possessed or owned several dogs – males and females of varying weights – over the years between 2013 and the July 2018 warrant execution on his residence. (See Exhibit A for examples of evidence seized from defendant's residence).

Electronic evidence seized from defendant revealed his extensive and continuous involvement with many dog fighters not limited to just his coconspirators, in every aspect of a dog fighting venture: breeding, training, transporting, and fighting. His electronic devices contain countless dog fighting videos and photos, including many of Katie. In addition, his text and chat communications with other dog fighters are filled with chat regarding his dog fighting ventures, including his stud searches, breeding attempts, puppies for sale, dog transport arrangements, dog fight set ups, fighting dog pedigree discussions, and everything Katie-related.

## B. LEGAL FRAMEWORK

The Animal Welfare Act makes it unlawful to "knowingly sponsor or exhibit an animal in an animal fighting venture" – *i.e.*, the animal fights themselves. 7 U.S.C. § 2156(a)(1). Recognizing that it is extremely difficult to detect a dog fight in progress – and not wanting law enforcement to wait until after dogs are maimed or killed in fights to try to disrupt the unlawful enterprise – Congress also criminalized the many predicate activities without which animal fighting would not occur. In particular, it is also unlawful to "knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture." 7 U.S.C. § 2156(b). Each of these violations is punishable by the same maximum penalty – five years in prison. 18 U.S.C. § 49.

## C. BACKGROUND REGARDING DOG FIGHTING

An organized dog fighting venture such as the one in which defendant and his coconspirators were involved bears no resemblance to the territorial quarreling pet dogs might have over food or a toy. It is a form of cruelty to animals – including the extreme forced weight loss and often grueling training involved before a match fight, the untreated injuries sustained inside the fighting ring by both dogs involved, and the not-so-immediate deaths occurring *after*

the dog fights from injuries. These dogs do not enjoy the lives of a pet and many of these dogs spend most of their lives in cages or restrained by heavy chains outdoors, and are kept in close distance to other fighting dogs, keeping the anxiety level high. Many dogs are exposed to "roll" or "play" fights in which the dogs are trained to lunge at each other under controlled conditions – sort of a training to test the dogs' aggressiveness or "gameness" to fight. Overall, dog fighting involves taking advantage of pit-bull type dogs' eagerness to please humans, all for gambling purposes, possible financial gain, or a disturbing form of "entertainment."

### D. FEDERAL DOG FIGHTING CASELAW

Congress first enacted the federal animal fighting prohibition in 1976.[3] It was not until approximately twenty-two years later that the statute was actually prosecuted in 1997 and not again until the prosecution of Michael Vick in 2007, in this very division of the Eastern District of Virginia. The Vick case exposed the public to the extreme animal abuse involved in dog fighting, including the animal suffering that occurs before, during, and after dog fights. In particular, the defendants in that case admitted as part of their guilty pleas to having routinely executed underperforming fighting dogs by drowning, hanging, and other brutal means. The following year, Congress increased the penalty from a misdemeanor to a five-year felony and significantly broadened the scope of the offense.[4]

Since 2008, law enforcement has increased its dog fighting prosecutions, but overall, only a few dozen cases have resulted. However, a notable trend emerged of above-Guidelines sentences, based primarily on the cruelty of the offense. Consequently, recognizing that a base offense level of 10 was inadequate, the U.S. Sentencing Commission increased the base offense

---

[3]   See Pub. L. No. 94-279, § 17, Apr. 22, 1976, 90 Stat. 421.
[4]   See Pub. L. No. 110-234, Title XIV, § 14207(a), May 22, 2008, 122 Stat. 1461 (initial passage); Pub. L. No. 110-246, § 4(a), Title XIV, § 14207(a), June 18, 2008, 122 Stat. 1664, 2223 (re-enacting entire Farm Bill after enrollment glitch).

level to 16 – the level at which it remains today [U.S.S.G. § 2E3.1] – stating that the increased base offense level "better accounts for the cruelty and violence that is characteristic of these crimes." Sentencing Guidelines for United States Courts, 81 Fed. Reg. 27,262, 27,265 (May 5, 2016).

Many defendants in dog fighting cases filed shortly before or since the increased offense level still received above-guidelines sentences, based on factors including other crimes involved, a defendant's extraordinary cruelty to the animals, or the defendant's offense involving a fighting venture on an exceptional scale. See Application Note 2 to U.S.S.G. § 2E3.1 (allowing for upward departure). Generally, courts have assessed extraordinary cruelty to be evidence beyond that which is intrinsic in the fighting pit, such as the extreme inhumane killing of dogs outside of the ring (i.e., – due to losing a fight) or severe neglect of the animals (i.e., – suffering from untreated dog fight injuries). Likewise, an upward departure based on animal fighting on an exceptional scale involves an offense with an unusually large number of animals. Although not all federal defendants in dog fighting cases have received above-Guidelines sentences, there has been a clear trend among judges in these cases to impose significant Guidelines sentences.[5] In many instances, the above-Guidelines sentences made up for the fact that the Guidelines did not account for the different levels of dog fighters and the varying degree of their involvement in a dog fighting enterprise.

The government submits that an above-Guidelines sentence is not warranted in this case but that a Guidelines sentence would be sufficient to meet the goals of sentencing based on the following analysis.

---

[5]    See Exhibit B for list of examples of sentencings in various federal dog fighting cases.

### E. SENTENCING ANALYSIS

#### 1. The Guidelines Range is 12- 18 Months

As stated above, the PSR correctly calculates defendant's total offense level as 13, derived from a base offense level of 16 for the count of conviction. See PSR at ¶¶ 66, 102; U.S.S.G. §§ 2E3.1(a)(1), 2X1.1. The government agrees with the Probation Office that this calculation is correct given the defendant clearly demonstrated acceptance of responsibility and in a timely manner. Applying a total offense level of 13 to defendant's criminal history category, the PSR correctly derived a final Guidelines range of 12 to18 months.

#### 2. A Guideline Sentence is Consistent with the Goals of Sentencing Set Forth in 18 U.S.C. § 3553(a).

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a):

(1)   "the nature and circumstances of the offense and the history and characteristics of the defendant;"
(2)   the four legitimate purposes of sentencing;
(3)   "the kinds of sentences available;"
(4)   the Guidelines range itself;
(5)   any relevant policy statement by the Sentencing Commission;
(6)   "the need to avoid unwarranted sentence disparities among defendants;" and
(7)   "the need to provide restitution to any victims."

18 U.S.C. § 3553(a)(1)-(7). See also United States v. Hughes, 401 F.3d 540 (4th Cir. 2005).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent a District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (quoting Gall v. United States, 128 S. Ct. 586, 597).

This is a federal dog fighting case in which the defendant knowingly conspired with other dog fighters and engaged in varying activities supporting a dog fighting venture that covered several states. The defendant's criminal conduct involved wagering and the suffering of dogs and continued to promote a cruel and violent form of entertainment and status. The evidence shows that some of these fights were chain weight or "roll" fights and others were the type of dog fight that involved a rigorous several-week training regimen, and usually lasted until one dog died or was near death. We know that the April 3, 2016, dog fight involving defendant's dog lasted approximately 45 minutes, that the defendant's dog won, and that the other dog died. We also know that the other fight that occurred that night involving coconspirators OA and MA also lasted approximately 40 minutes and that one of the dogs died on the way home to New Jersey and was dumped in a trash dumpster.

The evidence further shows that defendant subjected his dogs, including his Champion dog, Katie aka "Asesina", to multiple training "keeps" (the several-week long pre-fight training regimen), dog fights, and forced breeding attempts. As seen in a photograph seized from defendant's electronics, Katie is forcibly restrained while being bred with another fighting dog that is restrained with a leash. (See Exhibit A, page 19 (proof of breeding photograph saved from Facebook to defendant's cell phone on or about May 6, 2018)).

There are clearly varying levels of dog fighters: some who merely attend a fight here and there when invited; some who are professional handlers and are known as legends in the sport and dedicate all their time and money to their venture; and then there are some, like the defendant, who spend not all but a significant amount of time actively engaged in the dog fighting world, creating the best specimen to be a part of their "yard."

Defendant clearly and consistently engaged in the training, breeding, and maintaining of dogs in a manner consistent with dogs used for fighting purposes. As indicated above, agents found and seized only one dog at defendant's residence, but that dog was maintained in a manner consistent with a dog fighting venture: outside in a fully enclosed kennel, wearing a thick, padded collar, etc. Defendant possessed items, as detailed above, commonly used by dogfighters to train dogs for fights and treat them when injured without having to seek a veterinarian. Essentially, while defendant is not necessarily a ringleader in the sport, his involvement was indeed significant. In this case, a Guidelines sentence is necessary to meet the ends of Section 3553(a), as described in further detail below.

### (a)    Nature and Circumstances of the Offense

The PSR, Statement of Facts, and overt acts as outlined in the Information, contain numerous examples of defendant's criminal conduct. Defendant's conduct demonstrates that his offenses were intentional and significant. In fact, his criminal conduct did not involve a solitary violation or participation in a single fight that might be explained as a single instance of bad judgment or a limited scope of misconduct. Rather, the defendant played many roles. As a sponsor, transporter, trainer, and dog fighter, defendant persistently committed offenses over an extended period of time and with full knowledge that he was breaking the laws of the United States.

A dog fighting venture requires significant dedication over time, and defendant and his coconspirators devoted their time and effort toward engaging in this criminal activity. Any sentence should reflect the seriousness of the defendant's extensive involvement.

(b)     **History and Characteristics of the Defendant**

As described in more detail above, evidence gathered in this investigation and items seized from the defendant and his coconspirators showed that defendant had been involved in dog fighting since at least 2013, demonstrating that his involvement was not fleeting or casual, but a significant feature of his life for approximately a decade.

As described in the PSR, the defendant, however, grew up in a safe neighborhood with divorced parents, and had an average childhood. While he has never been married, he has two daughters who are both in college and live with him and his girlfriend. He has a Bachelor of Business Administration and owns his own truck hauling business, which has existed since 2010, and provides him with a secure income. See PSR ¶¶ 70-93.

In reading the PSR, defendant has positive aspects in his life: a business; and a supportive family. However, defendant also appeared to have another side to his life – and that was dog fighting – and according to the evidence, he worked as hard in this other life as he does in his trucking business.

(c)     **Seriousness of the Offense, Respect for the Law and Just Punishment**

Over the last decade, there has been increased public awareness of the serious, violent nature of animal fighting, as reflected by Congress's repeated strengthening of the Animal Welfare Act.[6] The recent amendment of the substantive guidelines by the Sentencing

---

[6]     Congress has strengthened the law four times over the last thirteen years, including: the Animal Fighting Prohibition Enforcement Act of 2007, Pub. Law 110–22, 121 Stat. 88, which increased animal fighting from a misdemeanor with a one-year statutory maximum to a felony with a three-year statutory maximum; the 2008 Farm Bill, Pub. Law 110–234, Sec. 12407, 122

Commission, as discussed above, further underscores the seriousness of the offense. See Sentencing Guidelines for United States Courts, 81 Fed. Reg. at 27,265 ("[t]he Commission [ ] determined that the increased base offense level better accounts for the cruelty and violence that is characteristic of these crimes"). Also, given the extensive, secretive networks that are needed to solicit opponents and to locate, buy and sell dogs of particularly coveted bloodlines, dog fighting is organized crime in the traditional sense of that term. The seriousness of this offense weighs in favor of a significant Guidelines sentence.

### (d)     Need to Afford Adequate Deterrence to Criminal Conduct

Deterrence comes in two forms: deterring the current defendant from committing additional crimes, and deterrence of future defendants from committing similar crimes. Dog fighting is a highly secretive enterprise that is difficult for law enforcement and investigative professionals to infiltrate. A dog fighting investigation requires many of the same skills and resources employed in major undercover narcotics investigations, thus challenging the resources of any agency that seeks to respond to it.

In defendant's case, evidence shows he had more than a casual friendship with coconspirator OA, with whom he participated in dog fights, including the April 2016 fight. Their dog fighting activity continued beyond the April 2016 fight until June 2016, when federal agents conducted a search warrant on OA's property, seizing his dogs and dog fighting-related equipment. Defendant was most likely aware of the June 2016 warrant, given his continued (social business) contact with OA. However, defendant continued to fully engage in furtherance

---

Stat. 923, which raised the statutory maximum to five years, relaxed the interstate commerce element, and added substantive prohibitions; and the 2014 Farm Bill, Pub. Law 113-79, Sec. 12308, 128 Stat. 649, which made attending animal fights a misdemeanor offense and added a felony offense for bringing anyone 16 years or younger to an animal fight.

of his dog fighting ventures, specifically through active engagement in dog breeding and transportation, and coordination of fights with numerous other dog fighters, including coconspirator CH. On July 11, 2018, federal agents simultaneously served warrants on defendant (who was not present at the time of the search warrant) and coconspirators CH and EP. The next day, defendant made several attempts to contact coconspirator OA, as well many other fighters with whom he had engaged in dog fighting activity. While this is not evidence in furtherance of the conspiracy beyond July 11, 2018, it indicates that a prior search warrant on a close fellow coconspirator was not sufficient to deter defendant from continuing his dog fighting activity and a significant sentence is merited.

Given the limited law enforcement resources available for cases such as this, and the strain it places upon municipal and charitable animal shelters, it is imperative that the sentences imposed in the cases that *are* able to be brought send a strong message of deterrence. Dog fighting tends to involve a private, closely-knit groups of individuals, but nevertheless, many other dog fighters are watching the outcome of this and other federal dog fighting cases in the country. Those who choose to brutalize animals for entertainment, profit, and status must know that their criminal conduct will be severely punished. Consequently, a Guidelines sentence, as set in the Guidelines range calculated in the PSR, is needed to "afford adequate deterrence to criminal conduct," both to defendant and to other similarly situated potential offenders. 18 U.S.C. § 3553(a)(2)(B).

> **(e)     Need to Avoid Unwarranted Sentence Disparities**

Defendant's advisory guidelines range in the PSR reflects the facts and circumstances of this case, and his criminal history. The multi-defendant federal dog fighting cases cited in Exhibit B to this memo also provide a reference point in avoiding unwarranted sentencing

disparities under 18 U.S.C. 3553(a)(6). Some of those cases cited defendants with varying roles in the conspiracy, and their varying sentences reflected that. Some of the other cases as in this matter, however, reflect defendants with similar roles and involvement, and their sentences reflected that also. The coconspirators in this case on all accounts were on par with each other as far as their experience and involvement in dog fighting ventures. They all possessed dogs over the years, and they were all involved in breeding, training, and fighting dogs – sometimes the fights were significant events, and others were roll fights or fights testing the dogs' "gameness" or willingness to fight. They all had similar training equipment and medical kits; they often shared the same transporters, and they often interacted with some of the same people in dog fighting.

At this time, only one of defendant's coconspirators has been sentenced and that is coconspirator MA from New Jersey who fought his dog and lost against coconspirator OA in the April 3, 2016, dog fight. (Defendant's coconspirator EP and opponent in the April 2016 dog fight is scheduled to be sentenced after defendant). On June 15, 2017, coconspirator MA plead guilty to sponsoring a dog in the April 2016 fight, as well as for possession of 18 dogs for purposes of participation in an animal fighting venture. He was initially charged in a complaint with a dog fighting conspiracy beginning in 2015 and ending in 2016, which involved eight other defendants. He was the first defendant to plead guilty to an information charging him with sponsoring a dog in the April 2016 dog fight and with possession of 18 dogs for dog fighting purposes. Coconspirator MA was sentenced, under the pre-2016 guidelines with a Guidelines range of 6-12 months, to a term of 24 months of imprisonment on each of the counts, to be served concurrently, and a $1,000 fine. See Transcript of Sentencing at 67-68, United States v. Atkinson, No. 3:17-CR-222-PGS-1, (D.N.J. Apr. 18, 2018) (Using pre-2016 Guidelines; varying

upwards by 12 months because "[t]here needs to be a longer period of imprisonment. We need to give a message to society that anyone that's involved in dog fighting is going to be subject to greater penalties than this, because the activity itself is depraved – it's just a very depraved activity; it's horrific and it's upsetting to everybody to see that our animal friends would be treated in such a manner"). To avoid a sentencing disparity with the defendant's coconspirators and to accurately reflect the specific charge against defendant and comparative length and significance of the defendant's involvement in dogfighting, a Guidelines sentence for the defendant is merited.

3.    **Special Conditions of Supervised Release**

The Court should also include the special conditions of supervised release recommended in the PSR. See PSR ¶ 5. The condition that Defendant be prohibited from possessing or owning any pit-bull type dogs or any breeds of dogs he intends to breed and/or sell, either personally or through a third party, is commonly imposed in dog fighting cases, and is appropriate given the nature of the offense.[7]

**F.  CONCLUSION**

Considering all of the 18 U.S.C. § 3553 sentencing factors, including the defendant's acceptance of responsibility and the relevant Guidelines provisions and case law discussed above, a Guidelines sentence as calculated in the PSR would be sufficient without being greater than necessary to fulfill the purposes of sentencing. The Court should also impose a term of three years of supervised release in this case. Given defendant's long-running participation in dog

---

[7]    See, e.g., United States v. Andrews, 7:16-cr-122, ECF No. 358 (Judgment) at 6 (E.D.N.C., Dec. 22, 2017); United States v. Love, 3:17-cr-51, ECF No. 295 (Judgment) at 3 (D.N.J. July 8, 2019).

fighting, the maximum term of supervised release – three years – is appropriate, to help ensure

that he does not return to the unlawful activity that played a prominent role in his life.  18 U.S.C.

§ 3583(b)(2).

Respectfully submitted,

| RAJ PAREKH<br>ACTING UNITED STATES ATTORNEY<br><br><br><br>_____/s/_____<br>Olivia L. Norman<br>Assistant United States Attorney<br>V.S.B. No. 31418<br>Office of the United States Attorney<br>919 E. Main Street, Suite 1900<br>Richmond, Virginia 23219<br>(804) 819-5475<br>(804) 771-2316 (facsimile)<br>Olivia.Emerson@usdoj.gov | TODD KIM<br>ASSISTANT ATTORNEY GENERAL<br><br><br><br>_____/s/_____<br>Shennie Patel<br>Trial Attorney, Environmental Crimes<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>150 M Street NE, Suite 4.111<br>Washington, D.C. 20002<br>(202) 305-0295<br>(202) 514-8865 (facsimile)<br>Shennie.Patel@usdoj.gov |
| --- | --- |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of August, 2021, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the counsel of record.


By:   _____/s/_____
SHENNIE PATEL
Trial Attorney, Environmental Crimes Section
Environment and Natural Resources Division
U.S. Department of Justice
150 M Street NE, Suite 4.111
Washington, D.C. 20002
(202) 305-0295
(202) 514-8865 (facsimile)
Shennie.Patel@usdoj.gov

18