## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-00024-JAG-1** |
| | : | |
| **CHESTER A. MOODY, JR.** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

COMES NOW the Defendant, Chester Moody, by and through his attorney, Michael E. Lawlor, Brennan, McKenna & Lawlor, Chtd., and submits this memorandum in support of the arguments to be presented by the defendant at the time of sentencing.

Chester Moody is a single father to two daughters, a loving brother, son, and a good friend to many.  He serves at the Chairman of the Trustee Board for the Men's Ministry at his church, where he has been a deacon for twenty years.  He is a graduate from Howard University and a local business owner.  Mr. Moody is also a man who has given much to his community. He mentors those reentering the community from prison and provides CDL training and employment opportunities for those who could otherwise not afford such training.  The conduct in this case represents a complete departure from who Chester Moody is as a person. In the ample time since his conduct in this case, both of Mr. Moody's daughters have graduated from high school—one is a rising junior at college and the other begins her freshman year this

1

fall semester.  Mr. Moody has also rededicated himself to religion in this time and through his church has found additional ways in which he can help his community. For all the reasons set forth below, a prison sentence is not warranted in this case, and Mr. Moody respectfully requests that this Court fashion a sentence below the guideline range.

## Procedural History

On April 2, 2021, via criminal complaint, the United States charged Chester Moody with conspiring to operate an animal fighting venture, in violation of 7 U.S.C. § 2156.

Mr. Moody was served a summons on April 13, 2021, and came before the Court for his initial appearance on April 28, 2021.  On that date, Mr. Moody waived indictment and pleaded guilty to the sole charge of the indictment, pursuant to an agreement with the Office of the United States Attorney. This Honorable Court accepted Mr. Moody's plea and released Mr. Moody on his own recognizance pending sentencing.

Sentencing is currently scheduled for August 27, 2021. This Memorandum in Aid of Sentencing is respectfully submitted in accordance with the scheduling Order of this Court dated April 28, 2021. ECF No. 13.

## A Reasonable Sentence in this Case

There are cases that demonstrate the pitfalls of traditional penological justifications for sentencing – this is one of them. The factors set forth at 18 U.S.C. § 3553(a)(2) are a codification of sentencing justifications: the need to reflect the seriousness of the crime; to afford deterrence; to protect the public; and to provide the defendant with needed educational and vocational training. Due to the minor nature of Mr. Moody's participation in this case (involving one canine), and that his conduct occurred between five and eight years ago, none of the penological justifications support a sentence of imprisonment for Mr. Moody.  As such, Mr. Moody is extremely thankful that he is not being sentenced under a mandatory sentencing scheme.  The ability of the judiciary to treat every defendant as an individual, regardless of the Guidelines calculations, is fundamental to a fair disposition of any case, but especially this one. Here, the sentencing range computed by the author of the PSR does not fairly and accurately capture the specific characteristics of either the offense or the offender in this case.  A sentence within the guidelines range for this case is greater than necessary to effectuate policies and goals of federal sentencing set forth at 18 U.S.C. § 3553(a).

The United States Supreme Court highlighted in *Pepper v. United States*, 562 U.S. 476 (2011), that the cornerstone of federal sentencing is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment

to ensue." *Id.* at 487 (internal quotation marks omitted). That process is embodied in the sentencing system instituted by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005).

In *Booker*, the Supreme Court held that the mandatory nature of the United States Sentencing Guidelines—particularly 18 U.S.C. Section 3553(b)(1), which purported to make the Guidelines mandatory upon federal courts—was unconstitutional. The Court struck the mandatory language of the statute and held that, although a sentencing court shall consult the guidelines in fashioning a sentence, the court is permitted to "tailor the sentence in light of other statutory concerns as well" with reference to the factors outlined in Section 3553(a). *Id.* at 245.

The core requirement of Section 3553(a) is that the Court impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set for in Section 3553(a)(2). Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the guideline range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense; to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence; to protect the public from future crimes and to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment. Courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the Guidelines, so long as the ultimate sentence is *reasonable* and carefully supported by reasons tied to the factors enumerated in Section 3553(a).

Consistent with the principle of individualized sentencing is the wide discretion afforded the sentencing judge "in the sources and types of evidence used to assist in determining the kind and extent of punishment to be imposed," in particular, "the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 477 ("[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant").

A.      **Plea Agreement, Criminal History, and Guidelines Calculation**

According to the stipulated facts and advisory guideline stipulation contained in the plea agreement, the defendant's base offense level is 16, pursuant to U.S.S.G. § 2E3.1(a)(1). In light of his acceptance of responsibility and timely notification of his intention to plead guilty pursuant to USSG § 3E1.1(a) and (b), Mr. Moody receives a downward adjustment of three levels. There are no other adjustments to the offense level. The Presentence Report (PSR) notes the same base and adjusted offense levels as agreed to in the plea agreement, and the PSR author calculated the

5

total offense level to be 13. PSR at ¶ 62.

Mr. Moody comes before the Court with no scorable convictions and thus is placed into criminal history category I. PSR at ¶ 66. According to the PSR, the sentencing guideline range for Mr. Moody is 12 to 18 months' imprisonment. *Id.* at ¶103.

**B.      Considerations Under 18 U.S.C. §3553(a)**

**1.      Nature of the Offense**

Mr. Moody took responsibility for his conduct in this case years after he voluntarily ceased that activity. Mr. Moody does not wish to minimize the seriousness of this conduct, as several animals perished as a result of injuries sustained.  However, it is still a non-violent offense in that no human persons were injured or involved as victims. Sentencing practice in the United States is turning toward alternatives to prison, especially for non-violent offenders. Much of the progression in sentencing practice has been driven by the realization that public safety concerns simply do not justify prison, in many of these cases.

The Department of Justice's "Smart on Crime" initiative addressed the over incarceration for non-violent low-level drug offenders. On March 13, 2014, then Attorney General Eric Holder stated:

> As it stands – and as this Commission has recognized – certain types of cases result in too many Americans going to prison for too long, and at times for no truly good public safety reason. Although the United States comprises just five percent of the world's population, we incarcerate

6

almost a quarter of the world's prisoners. One in 28 American children currently has a parent behind bars. State and federal governments spent a combined $80 billion on incarceration during 2010 alone. And as you know – of the more than 216,000 current federal inmates – nearly half are serving time for drug-related crimes.

This focused reliance on incarceration is not just financially unsustainable – it comes with human and moral costs that are impossible to calculate.

DOJ Press Release dated March 13, 2014.[1] Society is still incarcerating non-violent

offenders. Respectfully, we can do far better. While Mr. Moody is not a drug

offender, he is a non-violent offender. Mr. Moody committed a crime—that should

not equal a prison sentence under the circumstances. "Increased incarceration

accounted for less than one one-hundreth of the decline in property crime in the

2000s . . . [and] had no observable effect on the violent crime decline," in the same

time period. Oliver Roeder et al., *What Caused the Crime Decline?* (2017), 23.

Incarceration is not the answer.

### a.       Minimal Conduct Occurring Years Prior to Charges

Mr. Moody's conduct in this case was no longer active by the time he was

charged in this case.  The offense conduct, as agreed to in the Statement of Facts

contained in the plea agreement in this case, occurred between 2013 and July 11,

2018. PSR at ¶10. The latter date being the date authorities executed a search warrant

---

[1] The Attorney General testified before the Commission on March 13, 2014. The complete text of his testimony can be found in a Department of Justice press release easily accessible at http://www.justice.gov/opa/pr/2014/March/14-ag-263.html.

at Mr. Moody's residence. One canine was seized. Mr. Moody assisted a co-conspirator in setting up a dog-fighting kennel that the co-conspirator operated between 2013 and 2016. Aside from communications related to dog-fighting, the facts contained in the plea agreement state that Mr. Moody otherwise attended or participated in only a handful of fights. In comparison, at the time authorities executed a search warrant at the residence of co-conspirator Powe, 12 dogs were seized, 4 of whom were later deemed unadoptable and euthanized.

Again, the nature of dog-fighting is disturbing and the loss of life and loss of quality of life forced on these animals should not be tolerated. However, even the U.S.S.G. treat the offense as other gambling offenses, with no differences between levels of conduct accounted for by the individual guideline at Section 2E3.1.

**b.      U.S.S.G. Section 2E3.1**

The guideline set forth at U.S.S.G § 2E3.1 is problematic in two respects. First, the base offense level is unnecessarily high when compared to the base offense levels for more serious conduct. Second, as applied to codefendants or to similarly situated defendants, the guideline provides no mechanism to adjust the offense level based on the major, moderate or minor nature of an individual's conduct. As a result, Section 2E3.1 does not accurately account for Mr. Moody's individual conduct and the guideline range produced is greater than necessary to comply with the sentencing purposes set forth in Section 3553(a)(2).

There is no logic in the base offense level for this offense being 16.  Base offense level 16 is far greater than base offense levels set forth in the Guidelines for more serious crimes, including crimes against persons. For instance, an assault where the defendant possessed a dangerous weapon (including a firearm) and threatened its use, or where physical contact was involved is assigned a base offense level of 7. U.S.S.G. § 2A2.3(a).  If the victim in that scenario sustained serious bodily injury the base offense level is increased by 2 levels. U.S.S.G. § 2A2.3(b). Similarly, the base offense level for assault is 7, per U.S.S.G. § 2A2.3 and the base offense level for aggravated assault is 14, per U.S.S.G. § 2A2.2. In sum, Mr. Moody would have had a lower base offense level, and therefore lower guideline range, had he assaulted a person who sustained a serious bodily injury. Had he assaulted a person who did not incur an injury (BOL 7) with zero criminal history points, Mr. Moody's guideline range would be zero to six months. Rather, charged as he is, his guideline range is at least three times greater than it would have been had he assaulted a person.

In addition to an arbitrary base offense level, Section 2E3.1 provides no way to differentiate between a person who fights one dog, like Mr. Moody, and those who kennel 20-30 dogs.  The offense level for Count One as applied to co-conspirator Powe in this case, who housed and fought at least 12 dogs at a time, is the same – 16.  When one defendant's conduct is more serious than another, yet there is no change in the offense level, the offense level loses justification.  In the context

9

of illegally possessing weapons, the guidelines create a spectrum of offense conduct by increasing the offense level based on the number of firearms illegally possessed. U.S.S.G. § 2K2.1(b).  Initially, Section 2K2.1 provides a range of base offense levels from six to twenty-six. There is only one base offense level for operating an animal fighting venture, and no opportunity to increase that offense level based on the severity of conduct committed by the individual being sentence.  The failures of Section 2E3.1 create disparate sentences for those convicted of far more serious conduct.  The inability to adjust the offense level based on an individual's specific conduct makes the guideline ranges produced arbitrary.

**2.    A Prison Sentence is Unwarranted When Considering Mr. Moody's Characteristics and Applying Section 3553(a)(2)**

A prison sentence for Mr. Moody is greater than necessary to comply with the purposes set forth at U.S.S.G § 3553(a)(2).  Mr. Moody's conduct in this case does not represent who he is, especially as he stands before this Honorable Court over four years after his conduct in this case last occurred. Mr. Moody does not minimize the seriousness of the crime to which he pleaded guilty. As detailed supra, however, far more serious crimes net similarly situated defendants less serious sentences. Mr. Moody ceased his illegal behavior years ago and has shown no propensity to resume that activity.

The National Institute of Justice (NIJ), of the Department of Justice, collects and analyzes data on all things criminal justice related with the goal of "Strengthen

10

science. Advance justice." In May of 2016, the NIJ published "Five Things About Deterrence."[2] The NIJ reports "[r]esearch shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." *Id.* at 1. The NIJ also stated that "sending an individual convicted of a crime to prison isn't a very effective way to deter crime," even in some cases desensitizing inmates to the threat of future imprisonment. *Id.* While deterrence is still a recognized penological interest or justification, research and data show that sentences of incarceration do not serve a deterrent effect.

Protecting the public is perhaps the most important consideration when weighing sentencing options. Mr. Moody's conduct is aged, and the Court can be confident that his behavior since that time is likely to continue.  Mr. Moody poses no threat to the public, in fact, he is a pillar of his community who regularly gives his time and resources to those in need as is detailed, infra. Rather than having a successful term of months supervised by a federal agent, Mr. Moody's conduct over the past four years since his illegal conduct ceased demonstrates that he will not repeat such conduct. In order to best provide the Court with an accurate accounting of who Mr. Moody is aside from this case, several of his family members and friends have written to the Court on his behalf.  These letters are attached hereto as Exhibit

---

[2]  The summary report can be accessed at https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

A.  The contents of these letters explains that but for this case, Chester Moody has led a productive and law-abiding life.

    Ms. Cheree Moody asks for "as much leniency" as the Court can give to her brother – "I share a close and unbreakable bond with Chester.  I am his sister." Ms. Moody describes her brother as a good man, having matured into a caring and decent person.

> He's been an excellent friend to many, the sole provider to his two daughters and he is the rock that grounds my entire family. He has many friends that come to him for advice and guidance and I watch him counsel them and guide them with a seasoned hand. I am especially proud of the man he's become and don't want to see that interrupted in any way.

Ms. Moody describes how her brother started his own business and struggled to make a living to provide for his daughters. Now, Mr. Moody is depended on by a small staff. Several years ago, Mr. Moody underwent a spiritual awakening and committed to turning his life around.  Since then, he has impacted the lives of numerous people through his church.  Ms. Moody believes her brother's future is a positive one.  Ms. Moody writes that her brother's biggest accomplishment are the two daughters he raised by himself.  Although supported by his family, Mr. Moody took on the challenge.  As of this fall, both his daughters will be attending college, one as a junior and other a freshman.  Ms. Moody notes the two girls "are everything they are because of [their father]."  Ms. Moody has the utmost pride in her brother and closes her letter asking this Court to look at all the good her brother has done in

his life and sentence him as the man he is today. "Please do not disrupt the family that he has worked hard to solidify and most of all; I implore you to think of his children and all those that depend on him for guidance and strength in his life."

Mr. Terence Newton writes on behalf of his friend of over twenty years, affectionately called CJ.  In the years that the two have been friends, Mr. Newton recalls they have each had "bumps along the way."  But Mr. Moody has turned his mistakes into an opportunity to be "better, stronger, wiser."  Mr. Newton writes it is an honor for him to write this letter and share information about who he knows Chester Moody to be.

> Mr. Moody is a hard worker who in a challenging environment, and facing difficult circumstances built his company from the ground up. Knowing the circumstances of his community and the pitfalls that many he knew had succumb to, Mr. Moody began to forge a different path for himself by starting a trucking company with one truck 20 years ago. Through hard work and dedication over the years his company now boasts several trucks and has become a steady source of employment for his community. Community matters to Mr. Moody. Many of the lessons he's learned, his work ethic, and his compassion for others were developed in his community. As a spiritual person he has always believe in helping others and giving back whenever possible. Serving in this way is something he has been able to do as a Deacon in his church Redeeming Love Christian Tabernacle now for over 20 years. Serving the members of his church whether it be taking communion to those who are sick or disabled and unable to make it to church, or mentoring young black men in need of support from someone who understands them, Mr. Moody has a servant's heart and has extended a hand up to so many over the years.

Even with all he has given to the community, Mr. Newton writes that nothing is more important to him than his family, especially his daughters.  Mr. Moody has

also always made time to visit and check-in on Mr. Newton's parents. "This is the man I know Mr. Moody to be, and I ask you to take this into consideration during these proceedings."

Another close friend, Dante McEast, writes that he and Mr. Moody have known each other for forty years and "within that time he's been an amazing friend, father, business owner and Christian." In addition to single-handedly having raised two daughters now in college, Mr. Moody has always given to his community. "Chester has provided training and job opportunities for many members of the community who weren't able to afford CDL training or find employment elsewhere which is a testament to his character and giving nature." Mr. McEast adds that Mr. Moody's parents are both in poor health and prior to his current travel restrictions, he continually commuted to care for them. Mr. McEast asks the Court for leniency pointing to the man that Mr. Moody has become and the positive contributions he has made to the community. "I can say without a doubt that Chester is incredibly remorseful for his past and he's expressed many times that all his efforts are focused on a positive future."

Mr. Moody is a congregant of Redeeming Love Christian Fellowship Tabernacle, and on his behalf his pastor, the Reverend Robert Clemetson has written to the Court. Rev. Clemetson asks for leniency and compassion for Mr. Moody, who he helped come back to the church several years ago. Rev. Clemetson praises Mr.

14

Moody's success as a father and in the church.

> In the life of the church, he has distinguished himself by faithfully attending worship, bible study and group counseling and support opportunities. Through his university education in business and faithful service to the church, he has grown to become the Chairman of our Trustee Board and Men's Ministry.  As a result of his efforts, he has helped our church and individual members through numerous challenges.

Rev. Clemetson closes his letter asking the Court to look at Mr. Moody through the lens of who he has become, and to give him the opportunity to remain with his family and continue to serve the church and his community.

Lastly, Mr. Pete Gordon writes that Mr. Moody has been a volunteer in the Pathways to Success program sponsored by Employ Prince George's. Mr. Moody has been a role model and mentor for citizens returning to Prince George's County after lengthy terms of incarceration.

> Mr. Moody provides encouragement, hope, and "straight talk" to returning citizens, he insists that it takes hard work and determination to make a successful transition back into the community. Mr. Moody organizes, leads and invites men to a weekly men's support group every Monday night.

One Sunday per month, Mr. Moody can be found alongside Mr. Goodson at a local men's shelter where they prepare breakfast, share employment opportunities and support services to those in need. Mr. Moody has also hired returning citizens as CDL drivers and assisted them in obtaining their identification and birth certificates. "Chester Moody is a dedicated, committed, reliable volunteer and mentor."

## **Conclusion**

In light of the above, Mr. Moody respectfully requests that this Court exercise leniency in its ultimate resolution of this matter and consider the nature and circumstance of the offense conduct, Mr. Moody's voluntary post-offense rehabilitation, his capacity for change and giving to others, his employment record and the support of family and friends. For these reasons, and the reasons stated throughout this memorandum, Mr. Moody respectfully requests that this Court fashion a sentence below the guidelines.

Respectfully submitted,
/s/

_____
Michael E. Lawlor    (admitted pro hac vice)
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland  20770
301.474.0044
mlawlor@verizon.net

*Marc Eisenstein*

Marc J. Eisenstein
VA Bar No. 95482
Coburn & Greenbaum PLLC
1710 Rhode Island Ave, NW
(202) 657-4490
marc@coburngreenbaum.com

16

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 18, 2021, notice of the foregoing was sent to registered users via ECF.  A copy of the foregoing was sent, via electronic mail, to the United States Attorney's Office for the Eastern District of Virginia.


/s/

_____
Michael E. Lawlor